# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEVIN D. CARTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 09-493-SLR |
| | ) |
| MIDWAY SLOTS & SIMULCAST and | ) |
| HARRINGTON RACEWAY & CASINO, | ) |
| | ) |
| Defendants. | ) |

Kevin D. Carter, Felton, Delaware. Pro se Plaintiff.

Lauren Elizabeth Moak, Esquire, Young, Conaway, Stargatt & Taylor LLP, Wilmington, Delaware. Counsel for Defendants.

## MEMORANDUM OPINION

Dated: September $\partial 8$, 2012
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Kevin D. Carter ("plaintiff"), proceeding pro se, filed suit against defendants alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. (D.I. 2) Presently before the court is a motion for summary judgment filed by defendants Midway Slots & Simulcast and Harrington Raceway & Casino ("defendants"),[1] plaintiff's response, and defendants' reply. (D.I. 45, 49, 50) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons set forth below, the court will grant defendants' motion for summary judgment. (D.I. 45)

## II. BACKGROUND

Plaintiff was born in the United States and identifies himself as having an American origin of African descent (i.e., African American). Defendants operate a racetrack and casino in Delaware and they host the Delaware State Fair each July. Plaintiff was hired by defendants as a security officer in 2001. During his employment, plaintiff received promotions to dual rate lead officer and then to lead security officer, the position he held when he was terminated on July 26, 2007. Plaintiff alleges employment discrimination, wrongful termination, and retaliation by reason of race, color, and national origin. Plaintiff filed two charges of discrimination, and the Equal Employment Opportunity Commission ("EEOC") issued a right-to-sue notice on May 31, 2007. (D.I. 2; D.I. 46, A33, A48)

Plaintiff was promoted to dual rate lead officer in April 2005 and his responsibilities included supervising eight to ten security officers and standing in for the

---

[1]Defendants indicate that they are actually two operating names for a single business entity - Gaming Entertainment (Delaware), LLC. (D.I. 47 at 7)

lead officer, Thomas Malin ("Malin"), when Malin was off duty. On June 22, 2005, shift supervisor Robert Rockwell ("Rockwell") discovered plaintiff sleeping on the job, twice in one shift. Plaintiff did not deny sleeping, and Rockwell issued plaintiff a final warning. Following the incident, Rockwell authored a memorandum to plaintiff, dated June 28, 2005, outlining his duties and reminding him to comply with all company and departmental policies. (D.I. 46, A4-10, A19, A38-39, A42-44, A48, A60-64, A80, A107-09)

In November 2005, security officer James Dean ("Dean") reported to plaintiff that Malin had used a racial slur in front of him. Defendants' no harassment policy requires that employees report any suspected or perceived harassment to a supervisor or a Human Resources representative. Two months later, plaintiff reported the statement to the director of human resources, Scott Saxon ("Saxon"), after Malin had disciplined Dean for failing to report to work. Saxon then met with plaintiff, Dean, Malin, and Malin's immediate supervisor William Tharp ("Tharp"). Malin denied Dean's accusation. Saxon investigated the matter and asked plaintiff and Dean to identify other employees who could confirm Dean's version of the incident. Plaintiff and Dean provided the names of three employees. According to Dean, he gave Saxon the name of Grace West ("West"), who indicated that she had heard Malin use a racial slur in reference to plaintiff when she first started working for defendants. According to Saxon, he interviewed the three individuals but they did not corroborate the allegation or claim to have witnessed any inappropriate conduct. West was not one of the individuals interviewed. Plaintiff testified that he did not know Malin had a racial bias against him

2

until he learned of the racial comments. (*Id.* at A1-4, A11-12, A40-43, A47, A50-58, A64, A107-09; D.I. 49 Dean statement)

In July 2006, plaintiff was promoted to lead security officer, replacing Malin who had been promoted to shift supervisor. In considering the promotion, Saxon conferred with plaintiff's supervisors, including Malin who supported plaintiff's promotion to lead security officer. (D.I. 46, A18, A46, A107-109)

On October 24, 25, and 26, 2006, four security officers saw plaintiff sleeping during his shift on separate occasions over the course of these three days. The security officers were of varying backgrounds, including Hispanic, African American, and Caucasian. Malin was off from work and, when he returned, one officer reported that plaintiff did not answer a radio page on October 26, 2006. In the meantime, assistant director of security, Dave Zerbe ("Zerbe"), gave plaintiff a one-day suspension to take place on November 2, 2006. Malin spoke to other security officers to see what they knew and authored a report on November 5, 2006. (*Id.* at A5, A20-22)

Plaintiff disputed the suspension and stated to employee relations coordinator Britta Strop ("Strop") that, although he napped on breaks, he did not sleep while on duty. In addition, he stated that management was aware of the conduct and had not questioned it in the past. Plaintiff stated that Malin was unaware of the incidents and the suspension. Plaintiff was concerned that he had not been given a chance to defend himself and that his suspension was based solely upon an accusation made by another staff member. Plaintiff next met with Saxon to discuss the matter. Plaintiff indicated that Zerbe was direct in his delivery of the suspension. According to Saxon's memo, plaintiff was unwilling to cooperate and failed to provide any information that would

3

disprove the allegations made against him by members of the security department. Plaintiff stated that Saxon would not provide the names of the individuals who saw him sleeping. Both plaintiff's and Saxon's accounts indicate that the meeting between the two ended badly. (Id. at A23-24, A71-74)

Plaintiff filed a charge of discrimination with the EEOC on December 6, 2006. (Id. at A26-27) The charge of discrimination refers to race discrimination and retaliation that began on October 1, 2005 and ended on November 17, 2006 and alleges that harassment, discipline, and suspension occurred after plaintiff reported incidents of coworkers using racial slurs on the work-site, including one made about plaintiff. The charge of discrimination further states that plaintiff was disciplined for infractions that were routinely ignored and then harassed in retaliation for reporting previous employment discrimination. (Id. at A26)

On January 17, 2007, security operations supervisor Rockwell issued a memorandum reviewing the issue of sleeping on duty by security personnel.[2] The memo states: "At times although not specifically addressed; it was not impermissible to, briefly sleep (cat-nap) when clocked out for a meal break in the Sideshow or in the S/Office. Recent events and abuses have negated this issue from further occurring." "Effective immediately under no normal circumstance is any member of the Security Dept. while on a scheduled break when clocked in or on a scheduled meal break when clocked out permitted to sleep in any area frequented by or visible to any patron or Midway employee." The memo was distributed to all security personnel. (Id. at A23-24,

---

[2]At some point between June 2005 and January 2007, Rockwell was promoted to security operations supervisor.

A29, A72, A74-75)

During the Delaware State Fair in July 2007, plaintiff was responsible for security officers assigned to patrol the exterior of defendants' facility, including the parking lots. On July 21, 2007, Faron Kiser ("Kiser"), plaintiff, and another employee were assigned as outside supervisors. When Kiser arrived at work, plaintiff told him that he had not had a break all day. Kiser told plaintiff that once he got "situated" he would be back to relieve him. Kiser heard Malin radio plaintiff, but reception was not great due to the distance between Malin and plaintiff. Kiser heard plaintiff respond to Malin two to three times, but Malin did not reply. Kiser saw Malin and told him that he had heard plaintiff, but Malin insisted on going to the parking lot. By the time Kiser returned, Malin had left the parking lot. (D.I. 49, Kiser statement)

Malin reported that on July 21, 2007, three security officers who reported to plaintiff were unable to reach him via radio for a two-hour period, and the security officers sought his assistance. Apparently, Malin went to the parking lot twice. Plaintiff did not see Malin on either occasion because he was wearing a hoodie, slumped over, and not paying attention to noise because carts were being used. A note authored by security officer James Carey ("Carey"), an African American, states that he and Malin saw plaintiff asleep in his car in the parking lot.[3] Plaintiff told Malin that he was cold and

---

[3]At the time, plaintiff drove a truck, not a car.

was at his truck for only a few minutes. Malin sent plaintiff home.[4] (*Id.* at A29-31, A80-81; D.I. 49 Kiser statement; D.I. 51, C2)

On July 24, 2007, plaintiff authored a memo addressed to Jay Lewis ("Lewis"), head of the security department. Plaintiff advised that he had been unable to take a lunch break and, when Kiser arrived, plaintiff indicated that he was taking his break in his vehicle. Plaintiff stated that he answered radio or phone calls while on break. During his deposition, plaintiff testified that the individuals he supervised may have been unable to reach him due to poor radio reception. Saxon investigated the matter in response to plaintiff's memorandum. He concluded that the security officers' and Malin's version of the events were accurate. In addition, Carey emphatically denied that he had felt coerced by Malin to claim he had seen plaintiff sleeping, and was firm in his statement that he had seen plaintiff sleeping. Plaintiff was terminated on July 26, 2007, for repeatedly sleeping on duty without the knowledge of his supervisor. The termination memo was authorized and signed by Saxon and Rockwell. (*Id.* at A5, A30, A32-34, A82, A107-09; D.I. 49 Kiser statement)

On October 31, 2007, plaintiff filed a charge of discrimination with the EEOC asserting that he was discharged in retaliation for filing his previous charge of race discrimination. The charge further alleges that similarly situated employees engaged in

---

[4]During his deposition, plaintiff testified that Malin is the only manager with whom he had a problem. He did not feel that other managers were biased based upon race or other criteria. Plaintiff testified that Malin did not do things directly to him, but made comments to white employees. In addition, Malin had implied that plaintiff was stupid in reference to the taking of a test and in not wearing a badge while on duty. Plaintiff does not know if Saxon has a racial bias, but testified nothing happened in his presence. (D.I. 46, A47, A58-59, A92, A104-05)

similar conduct, but they were not discharged. Plaintiff testified that the following
individuals were treated more favorably than he: (1) Derrick Bowman (Caucasian),
plaintiff's subordinate, who had an excessive number of unexcused absences during his
probation period and was not terminated; (2) Juan Martinez (Hispanic), plaintiff's
subordinate, who missed a number of days and only received a written warning;
(3) Sam Reynolds[5] (Caucasian), plaintiff's subordinate, who engaged in gross
misconduct for repeated sleeping on the job, until eventual termination; (4) Grace West
(Caucasian), plaintiff's subordinate, who was not disciplined for sleeping on the job; and
(5) James Carey (African American), plaintiff's subordinate, who had excessive
absences, without discipline. Bowman, Martinez, Reynolds, West, and Carey were
either supervised by plaintiff or reported to him. (D.I. 46, A35-36, A95-102)

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving
that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are
'material,' and disputes are 'genuine' if evidence exists from which a rational person
could conclude that the position of the person with the burden of proof on the disputed
issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1

---

[5]On April 18, 2006, Reynolds was issued a final warning for dozing on the job on
March 26, April 3, and April 18, 2006. On April 24, 2006, Reynolds received a three-day
suspension after plaintiff saw him sleeping on the job on April 19, 2006. On April 28,
2006, Reynolds was terminated for unacceptable performance. (D.I. 36, A13-17)

7

(3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Blozis v. Mellon Trust of Delaware Nat'l Ass'n*, 494 F. Supp. 2d 258, 267 (D. Del. 2007) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

Defendants move for summary judgment on the grounds that: (1) plaintiff did not exhaust administrative remedies on the claim of national origin discrimination; (2) the claim of disparate treatment based upon race and color must be dismissed because

8

plaintiff failed to present evidence to support the claim; (3) plaintiff cannot state a claim for hostile work environment based upon race and color because he failed to identify severe or pervasive discriminatory conduct; (4) the retaliation claim is factually and temporally unrelated to plaintiff's protected activity; and (5) there is no evidence that defendants' legitimate non-discriminatory reasons for their conduct are pretextual.

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

The complaint alleges discrimination based upon race, color, and national origin, but contains no facts to support the national origin claim. In addition, plaintiff's charges of discrimination allege race discrimination and retaliation, but do not mention national origin discrimination. Defendants move for summary judgment on the national origin discrimination claim for failure to exhaust administrative remedies.

Before instituting a lawsuit under Title VII, a plaintiff must first exhaust administrative remedies by filing a charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e); *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 472 (3d Cir. 2001). "[F]ederal courts lack jurisdiction to hear a Title VII claim, unless the plaintiff has filed a charge with the EEOC." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 926 (3d Cir. 1997) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)).

Generally, "if the allegations in the administrative complaint could be 'reasonably expected to grow out of' those made in the EEOC charge . . . the administrative remedies available to plaintiff will have been exhausted." *Schouten v. CSX Transp.*, Inc., 58 F. Supp. 2d 614, 616 (E.D. Pa. 1999); *see also Webb v. City of Philadelphia*, 562 F.3d 256, 263 (3d Cir. 2009). Thus, "a district court may assume jurisdiction over

9

additional charges if they are reasonably within the scope of the complainant's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims." *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984). When a plaintiff fails to exhaust administrative remedies, a court should dismiss the unexhausted claims. *Id.* at 87-88.

Here, the charges of discrimination make no reference to a national origin claim. *See Jeffries v. Potter*, 2009 WL 423998, at \*5 (D. Del. Feb. 19, 2009) (charge of discrimination raising race discrimination, with the absence of any information related to national origin discrimination, did not exhaust administrative remedies for the national origin claim). Moreover, plaintiff did not respond to this ground for summary judgment. Accordingly, the court will grant the motion for summary judgment on the national origin discrimination claim.

## B. Race Discrimination

Defendants argue that plaintiff cannot make a prima facie case of race discrimination. A plaintiff may prove race discrimination by direct evidence as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-46 (1989), or indirectly through the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Direct evidence" is evidence sufficient to allow the jury to find that "the decisionmakers placed substantial negative reliance on [race] in reaching their decision." *Price Waterhouse*, 490 U.S. at 277.

Construing the facts in the light most favorable to plaintiff, the record reflects that Malin made racist comments, but not to plaintiff. Plaintiff testified that Malin did not do things directly to him. The record further reflects that Malin supported plaintiff's first

10

promotion. While plaintiff complains about Malin, the evidence does not establish that defendants' decisionmakers placed substantial negative reliance on plaintiff's race in disciplining or terminating him. In view of the foregoing, the court finds that plaintiff failed to present direct evidence that he was disciplined and/or terminated due to his race.

Therefore, the court turns to the familiar *McDonnell Douglas* burden-shifting framework. Under this framework, plaintiff must first establish a prima facie case of race discrimination by proving that: (1) he is a member of a protected class; (2) he suffered some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected class is treated differently. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999). The elements of a prima facie case may vary depending on the facts and context of the particular situation. *See Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).

If plaintiff succeeds in establishing his prima facie case, the burden shifts to defendant employer to proffer "legitimate non-discriminatory" reason for its actions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If defendant meets this burden, the burden again shifts to plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual. *Id.* at 142-43. To do this, plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). "[T]o avoid summary judgment, the plaintiff's

11

evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Harding v. Careerbuilder, LLC*, 168 F. App'x 535, 537 (3d Cir. 2006) (unreported) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (internal citations and other citations omitted).

Defendant argues that plaintiff has failed to establish the third prong of the prima facie case, that is, that the discipline and termination occurred under circumstances giving rise to an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected class is treated differently. To make a comparison of plaintiff's treatment to that of an employee outside plaintiff's protected class for purposes of a Title VII claim, the plaintiff must show that he and the employee are similarly situated in all relevant respects. *See Houston v. Easton Area Sch. Dist.*, 355 F. App'x 651, 654 (3d Cir. 2009) (not published) (citations omitted). Whether a factor is relevant for purposes of a similarly situated analysis must be determined by the context of each case. *Houston*, 355 F. App'x at 654.

In addition, "in disciplinary cases or in the context of personnel actions, for example, the relevant factors often include a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Houston*, 355 F. App'x at 654 (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000); *see Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 381 (2008) (evidence offered in a

12

discrimination case concerning purported comparators with different supervisors is neither per se admissible nor per se inadmissible). In a severance case, the relevant factors may include the positions held, policies or plans in effect, the decisionmakers, and the timing of the separation. *Id.* (citing *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54-55 (2d Cir. 2001) (plaintiff established she was similarly situated to a colleague who received more money in severance where the two employees "held positions of roughly equivalent rank . . . were fired at roughly the same time, [and] the decisions with respect to the severance were both made at the highest levels of the company"). Plaintiff is not required to show that he is identical to the comparator in each relevant factor, "but he must show substantial similarity." *Id.* (citation omitted). Accordingly, in order to establish an appropriate class of similarly situated comparators, plaintiff must identify employees who share characteristics that are relevant to the facts of this case.

In the instant case, with regard to discipline or termination, the individuals to whom plaintiff compares himself as having been treated more favorably did not hold the same position as plaintiff. They were subordinate to him. In addition, three of the comparators were disciplined for violating defendants' attendance policy, not the policy that prohibits sleeping on the job. Finally, similar to plaintiff, but of a different race (i.e., Caucasian), one comparator was discharged for sleeping on the job.

Plaintiff further contends that discrimination occurred with regard to disciplinary actions, because Malin was allowed to confront his accusers, but he was not. Plaintiff and Malin, however, did not engage in similar conduct. Malin reportedly used racist language, and plaintiff allegedly was seen sleeping on the job.

13

In light of the foregoing, the court finds that plaintiff has failed to meet his burden to establish a prima facie case of race discrimination.

## C. Hostile Work Environment/Harassment

Defendants contend that summary judgment is appropriate on the basis that plaintiff cannot make a prima facie case of a hostile work environment because there is no evidence of conduct motivated by unlawful racial animus and the conduct was not severe and pervasive. They further argue that, even if plaintiff establishes a prima facie case, he failed to report any alleged harassment.

A plaintiff can establish a violation of Title VII by proving that discrimination created a hostile or abusive work environment. *Clegg v. Falcon Plastics, Inc.*, 174 F. App'x 18, 25 (3d Cir. 2006) (not published) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). In order to establish a hostile work environment claim under Title VII, plaintiff must show that: (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe and pervasive; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability. *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007).

Not all workplace conduct that may be described as harassment rises to the level of a hostile work environment. *Clegg*, 174 F. App'x at 25. Several factors inform that determination such as the severity of the harassment, the frequency of the harassment, and the degree of abuse. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances,

14

including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (internal quotes and citations omitted). Hence, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.* at 271. *See also Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (noting that the standard for judging hostility under Title VII must be sufficiently demanding so that the statute does not become "a general civility code").

Defendants contend that plaintiff has identified three incidents of harassment during five years of employment: (1) an isolated statement by Malin indicating that plaintiff "doesn't know anything;" (2) an isolated statement by Malin regarding plaintiff's failure to have his badge while on duty; and (3) Saxon's behavior following the November 17, 2006 meeting with plaintiff. Defendants argue that none of the incidents, alone or together, satisfy plaintiff's burden. Conversely, plaintiff argues that Malin constantly belittled him to fellow employees, gave low opinions and placed him in a false light, and referred to him on two occasions using racial slurs. Plaintiff contends that he told Saxon on more than one occasion that he did not want to work with Malin.

The only evidence of racial animus of record is that Malin used racial slurs on two occasions; once in November 2005, and on an unknown date when West began her employment with defendants. Neither comment was made in the presence of plaintiff. Only one of the comments was made in reference to plaintiff. *See Carver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005) (police officer could not meet causation

15

element of hostile work environment claim by pointing to comments that were directed at other individuals, when the officer could not show that comments would not have been uttered or written but for his race if officer was neither on the receiving end nor the subject of any comments). Although plaintiff alleges that, on unknown dates, Malin made comments about him to other employees and implied that he was stupid, the record reflects that plaintiff was promoted in April 2005 and again in July 2006 (with the support of Malin). Plaintiff concedes that he did know if Saxon is a racist or has a racial basis.

In the instant case, the record reflects scant discriminatory events personal to plaintiff: the derogatory comment made about him by Malin to West, and comments Malin made on two separate occasions that plaintiff believed implied he was stupid.[6] At best, the record reflects isolated acts that are not so severe as to demonstrate, if proved, an abusive situation constituting a hostile work environment. *See Woodard v. PHB Die Casting*, 255 F. App'x 608, 608-609 (3d Cir. 2007) (not published) (summary judgment granted because burning cross and KKK sign drawn on rest room was not removed for three months after reported by plaintiff was insufficient to state claim for hostile work environment); *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 608, 611 (E.D. Pa. 2001) (granting summary judgment to defendant on hostile work environment claim where plaintiff alleged that supervisor subjected plaintiff to "constant and unremitting negative comments and evaluations" based at least in part on plaintiff's race, referred to black community as a "baby factory," stated that blacks are incapable of thinking analytically,

---

[6]Once, when plaintiff was taking a test, and the other when plaintiff was not wearing a badge while on duty.

16

and warned the plaintiff, who was black, not to talk to white women); *Morgan v. Volenti Mid-Atlantic Mgmt.*, 2001 WL 1735260, at \*3 (E.D. Pa, Dec. 14, 2001).

After viewing the record in the light most favorable to plaintiff, and considering the totality of the circumstances, including the paucity of racially charged incidents that occurred during plaintiff's employment, the court concludes that no reasonable jury could find that the claimed harassment was sufficiently severe or pervasive so as to create a hostile working environment. For the above reasons, the court will grant defendants' motion for summary judgment on the issue of a hostile work environment.

## D. Retaliation

Defendants contend that plaintiff cannot make a prima facie case of retaliation because the alleged retaliatory acts were not causally connected to plaintiff's protected activity and, therefore, summary judgment is appropriate. To establish a prima facie case of retaliation under Title VII, a plaintiff must show the following: (1) he engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in that conduct, his employer took an adverse action against him; (3) the adverse action was "materially adverse;" and (4) there was a causal connection between his participation in the protected activity and the adverse employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006); *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006); *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001). A materially adverse employment action means "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (citation and internal quotation omitted). Whether an action is materially adverse "often depends on a constellation of surrounding circumstances, expectations,

17

and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Id.

With respect to the causation prong, the court considers whether a reasonable jury could link the employer's conduct to retaliatory animus. See Jensen v. Potter, 435 F.3d 444, 449 n.2 (3d Cir. 2006) (explaining "[t]he ultimate question in any retaliation case is an intent to retaliate vel non"). In assessing this, the court considers the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and "the existence of a pattern of antagonism in the intervening period." Id. at 450 (quotations and citations omitted). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. at 273-74 (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four month period insufficient).

Plaintiff raises two retaliation claims: the first, when plaintiff was written up, not allowed to face his accusers, and received a one-day suspension (October 2006), following his January 2006 report of Malin's racial statements to Dean and West; and the second, when plaintiff was terminated from employment (July 2007), following the report of Malin's racial statement and plaintiff's December 6, 2006 filing of a charge of discrimination. Defendants argue that, while plaintiff engaged in two acts of protected activity, he cannot fulfill the third prong of the prima facie case to show there is a causal link between the protected activity and defendants' subsequent actions.

18

In the instant case, the court finds that the ten-month proximity between plaintiff's January 2006 complaint about Malin and the write-up, hearing and one-day suspension in October 2006, and the eight-month proximity between plaintiff's filing of the charge of discrimination and termination, without more, are not sufficient to establish plaintiff's prima facie case. In addition, even when viewing the facts in the light most favorable to plaintiff, the record reflects that defendants' actions were based not only upon Malin's observations and report, but also based upon other employee reports and investigations, the authors of which have not been identified as having a discriminatory animus.

The court finds that the evidence of record fails to demonstrate the existence of causation and, therefore, plaintiff cannot make a prima facie showing of retaliation as a matter of law. Therefore, the court will grant summary judgment on the retaliation issue.

## E. Cat's Paw Theory

Plaintiff relies upon the cat's paw theory to support his claim and to defeat defendants' motion for summary judgment.[7] He argues that Malin made false reports against him. Defendants respond that the theory fails because their conduct was supported by an independent investigation and statements from unbiased employees.

---

[7]"The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward." *Staub v. Proctor Hosp.*, ___U.S.___, 131 S.Ct. 1186, 1190 n.1 (2011) (internal citation omitted).

19

The subordinate bias, or "cat's paw," theory states that an employer is liable for race discrimination when a non-biased decision-maker is influenced by a biased managerial employee. *See McKenna v. City of Philadelphia*, 649 F.3d 171 (3d Cir. 2011); *Staub v. Proctor Hosp.*, ___U.S.___, 131 S.Ct. at 1193-94 (with respect to termination subsequent to an employer's inquiry, "if the [employer's] independent investigation relies on facts provided by the biased supervisor - as is necessary in any case of cat's-paw liability - then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor").

In the instant case, plaintiff cannot establish that the retaliatory motives of Malin, assuming they existed, proximately caused plaintiff's suspension in November 2006 and his termination in July 2007. With regard to the suspension, the evidence of record indicates that complaints were made that plaintiff was sleeping on the job during a time-period when Malin was not working. In addition, while plaintiff protested the suspension, he did not deny napping during his lunch break. Also, plaintiff indicated that Malin was not aware of the incidents or the suspension. Indeed, the record reflects plaintiff's one-day suspension took place on November 2, 2006, but Malin's report of his investigation of the incidents was not complete until November 5, 2006. With regard to the July 2007 termination, Malin was not the only individual who claimed to see plaintiff asleep in his vehicle. While plaintiff argues that Malin made false statements about him, plaintiff was also seen sleeping by Carey, who is an African American.

Moreover, the evidence of record does not prove that the actual reason underlying the one-day suspension and termination was plaintiff's race or color. It is plaintiff who

bears the burden of producing evidence that race-based discrimination was the motivating factor for the employment decisions. *See Staub v. Proctor Hosp.*, 131 S.Ct. at 1193-94. Finally, as discussed below, even if plaintiff could establish a prima facie case of discrimination utilizing the cat's paw theory, he cannot demonstrate that defendants' justification for his suspension and termination were pretexts for race based discrimination.

## F. Pretext

Assuming arguendo that plaintiff had established a prima facie case for his claims of race/color discrimination, hostile work environment, and retaliation, his claims cannot survive summary judgment, as defendants have provided legitimate, nondiscriminatory reasons for their decisions to discipline and terminate him. Notably, plaintiff has not pointed to sufficient record evidence from which a reasonable fact finder could conclude that the reasons were pretexts for discrimination.

The evidence and documentation, particularly internal reports, indicate that plaintiff was disciplined, suspended, and ultimately terminated for violation of the policy that prohibited sleeping on the job. The record reflects that plaintiff has a history of sleeping on the job. He was written up in June 2005 for sleeping on the job, twice in one shift. The second occasion occurred when plaintiff's subordinates complained that, on three consecutive days, they saw him sleeping on the job. Plaintiff received a one-day suspension. Plaintiff disputed the suspension but, according to Saxon's report, did not provide information to disprove the allegations. The last incident that led to his termination occurred after employees complained they were unable to contact plaintiff by radio. Malin searched for plaintiff, and he and Carey found plaintiff in his vehicle. It

appeared to both Malin and Carey that plaintiff was asleep. Plaintiff asserted to management that Carey felt coerced into stating that plaintiff was asleep, but Carey denied he was coerced and was firm that he had seen plaintiff sleeping.

There is nothing before the court that contradicts the proffered reason for plaintiff's discipline and termination. Nor are defendants' proffered reasons for their action weak, incoherent, implausible, or so inconsistent that a reasonable factfinder could rationally find it unworthy of credence. *See Sarullo v. United States Postal Service*, 352 F.3d 789, 800 (3d Cir. 2003). Construing the evidence in the light most favorable to plaintiff, he has not provided evidence from which a fact finder could either disbelieve defendants' articulated reasons, or believe that a discriminatory reason was more likely than not the cause of the employment actions. Therefore, the court will grant defendants' motion for summary judgment on the issue of pretext.

## V. CONCLUSION

For the above reasons, the court will grant defendants' motion for summary judgment.

An appropriate order will issue.